**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NORTHWESTERN CORPORATION, | : | |
| | : | Case No. 03-12872 (KJC) |
| Reorganized Debtor. | : | |
| | : | |
| THE PLAN COMMITTEE OF | : | |
| NORTHWESTERN CORPORATION, | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civil Action No. 06-157 (JJF) |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| | : | |
| Appellee. | : | |
| | : | |
| AD HOC COMMITTEE OF CLASS 7 | : | |
| DEBTHOLDERS, | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civil Action No. 06-158 (JJF) |
| NORTHWESTERN CORPORATION, | : | |
| | : | |
| | : | |
| Appellee. | : | |

**ANSWERING BRIEF OF APPELLEES**
**MAGTEN ASSET MANAGEMENT CORPORATION AND**
**LAW DEBENTURE TRUST COMPANY OF NEW YORK**

**FRIED, FRANK, HARRIS, SHRIVER &**
  **JACOBSON LLP**
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

**NIXON PEABODY LLP**
John V. Snellings
Amanda Darwin
100 Summer Street
Boston, MA 02110
Telephone:    (617) 345-1201
Facsimile:     (866) 947-1732

-and-                                                    -and-

**BLANK ROME LLP**

Dale R. Dubé (DE No. 2863)
Bonnie Glantz Fatell (DE No. 3809)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:   (302) 425-6400
Facsimile:   (302) 425-6464

Counsel for Magten Asset Management
Corporation

Dated:  May 11, 2006
Wilmington, Delaware

**SMITH, KATZENSTEIN & FURLOW LLP**

Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE  19899
Telephone:   (302) 652-8400
Facsimile:   (302) 652-8405

Counsel for Law Debenture Trust Company
of New York

# TABLE OF CONTENTS

I.      Preliminary Statement...........................................................................................................1

II.     Statement of Appellate Jurisdiction ....................................................................................3

III.    Statement of Issues ..............................................................................................................3

IV.     Standard of Appellate Review .............................................................................................3

V.      Factual Background ..............................................................................................................5

VI.     Argument ............................................................................................................................11

    1.    The Bankruptcy Court Correctly Took Account of the QUIPS
       Stipulation When Rendering its Decision ..............................................................12

    2.    The Plan Committee's Argument Fails to take into Account the
       Practical Definition and Concept of a "Surplus" Applicable to
       Section 7.7 of the Plan ...........................................................................................14

    3.    The Bankruptcy Court Properly Denied the Plan Committee Motion
       in Light of the Prohibition of Unfair Discrimination Pursuant to
       Section 1129(b)(1) of the Bankruptcy Code...........................................................15

CONCLUSION.............................................................................................................................19

120087.01600/40162000v.1

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*In re Armstrong World Indus., Inc.*,
    432 F.3d 507 (3d Cir. 2005) ................................................................................................... 15

*Beal Bank v. Jack's Marine, Inc.*,
    201 B.R. 376 (E.D. Pa. 1996) .................................................................................................. 18

*Comm'n of Dep't of Pub. Utils. v. New York, New Haven & Hartford R.R. Co.*,
    178 F.2d 559 (2d Cir. 1949) ...................................................................................................... 4

*Endois Corp. v. Employers Ins. of Wausau (In re Consol. Indus. Corp.)*,
    360 F.3d 712 (7th Cir. 2004) ..................................................................................................... 4

*In re Exide Techs.*,
    303 B.R. 48 (Bankr. D. Del. 2003) ........................................................................................... 16

*First Western SBLC, Inc. v. MAC-TAV, Inc.*,
    231 B.R. 878 (D.N.J. 1999) ...................................................................................................... 4

*Finova Capital Corp. v. Larson Pharmacy Corp. (In re Optical Techs., Inc.)*,
    425 F.3d 1294 (11th Cir. 2005) ................................................................................................. 4

*Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Business Forms, Inc.)*,
    341 F.3d 738 (8th Cir. 2003) ................................................................................................. 3, 4

*In re Genesis Health Ventures, Inc.*,
    280 B.R. 339 (Bankr. D. Del. 2002) ......................................................................................... 16

*Hills Motors, Inc. v. Haw. Auto. Dealers' Ass'n*,
    997 F.2d 581 (9th Cir. 1993) ..................................................................................................... 4

*In re O'Connor*,
    258 F.3d 392 (5th Cir. 2001) ..................................................................................................... 4

*Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*,
    166 B.R. 892 (B.A.P. 9th Cir. 1994) ........................................................................................ 16

*Terex Corp. v. Metro. Life Ins. Co. (In re Terex Corp.)*,
    984 F.2d 170 (6th Cir. 1993) ..................................................................................................... 4

*USN Commc'ns, Inc. v. Worldnet Corp. (In re USN Commc'ns, Inc.)*,
    280 B.R. 573 (Bankr. D. Del. 2002) .......................................................................................... 3

*In re Weber*,
25 F.3d 413 (7th Cir. 1994) ........................................................................................................4


## **STATUTES**

11 U.S.C. § 1123................................................................................................................................16

11 U.S.C. § 1127................................................................................................................................17

11 U.S.C. § 1129.............................................................................................................3. 12. 15, 16, 18

28 U.S.C. § 158 ...................................................................................................................................3


## **RULES**

Bankr. R. 8001 ....................................................................................................................................3


## **OTHER AUTHORITIES**

*Webster's II New College Dictionary* ...............................................................................................14

120087.01600/40162000v.1

The appellees, Magten Asset Management Corporation ("Magten") and Law Debenture

Trust Company of New York ("Law Debenture", together with Magten, the "Appellees"), in its

capacity as Indenture Trustee of the Series A 8.45% Quarterly Income Preferred Securities (the

"QUIPS") hereby submit this answering brief (the "Brief") in response to the opening brief of

appellant, the Plan Committee (the "Plan Committee"),[1] appointed in the chapter 11 case of

NorthWestern Corporation ("NorthWestern") pursuant to section 7.9 of NorthWestern's Second

Amended and Restated Plan of Reorganization (the "Plan"), (see App. Des. No. 10)[2], under Chapter

11 of title 11 of the United States Code (the "Bankruptcy Code"), in connection with the Plan

Committee's appeal (the "Appeal") from an order (the "Order") (see App. Des. No. 92), of the

United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") denying the

Plan Committee's Motion in Aid of Consummation and Implementation of the Plan for an Order

Authorizing and Directing NorthWestern to Distribute Surplus Distributions (the "Plan Committee

Motion"). See App. Des. No. 73.  In support of this Brief, Appellees respectfully state as follows:[3]

## I.    Preliminary Statement

The Plan Committee is seeking to have this Court overturn the Bankruptcy Court's denial of

the Plan Committee's request  for a "surplus" distribution of New Common Stock out of the

Disputed Claims Reserve even though certain substantial Disputed Claims remain outstanding and

there is, therefore, no way to determine that a surplus exists.

The Plan Committee asserts that section 7.7 of the Plan mandates a supplemental

distribution of shares from the Disputed Claims Reserve because certain Disputed Claims were

---

[1]      Appellees also file this Brief in response to the Joinder of the Ad Hoc Committee of Class 7 Debtholders to the Opening Brief of the Plan Committee.

[2]      References to items identified in the Plan Committee's Designation of Items to be Included in the Record on Appeal and Statement of the Issue to be Presented on Appeal (Bankr. Docket 3446) are referred to as "App. Exh. __." Appellees Joint Designation of Additional Items to be Included in the Record on Appeal of Magten and Law Debenture (Bankr. Docket No. 3450) are referred to as "Appellees Exh. __."

[3]      All capitalized terms not expressly defined herein have the meanings ascribed to them in the Plan.

settled for less than the amount set aside for such claims in the Disputed Claims Reserve. In denying the Plan Committee Motion, the Bankruptcy Court determined that "Section 7.7 of the Plan requires full resolution of *all* disputed claims before there can be any Surplus Distribution and does not require NorthWestern to distribute Surplus Distribution from the Disputed Claims Reserve every six (6) months from the Effective Date of the Plan." See App. Des. No. 92, p. 3 (emphasis added). In rendering its decision, the Bankruptcy Court correctly concluded that "[t]he [Plan Committee] Motion was premature in view of the litigation surrounding the unresolved and disputed claims of Magten . . . and Law Debenture . . . ." See App. Des. No. 92, p. 3.

Given that the claims of Magten and Law Debenture are in excess of $50 million, the Bankruptcy Court reached the only rational conclusion – there can be no determination that a surplus exists. A "surplus" by definition, can only exist if there are sufficient shares of New Common Stock to adequately satisfy *all* Disputed Claims in full. In that regard, a "surplus" distribution prior to the resolution of all Disputed Claims would leave Appellees with the unfair and inequitable result of potentially recovering less than the full amount of their allowed claim – the precise injustice that section 7.5 of the Plan was designed to avoid.

In addition, in denying the Plan Committee Motion, the Bankruptcy Court further determined that section 7.7 of the Plan must be read in conjunction with the stipulation entered into between NorthWestern and Law Debenture (the "QUIPS Stipulation") and approved by the Bankruptcy Court over a year and a half ago following notice and a hearing. See App. Des. No. 33. The Plan Committee's arguments disregard the QUIPS Stipulation, which established a "sub reserve" within the Disputed Claims Reserve and specifically provides Appellees with the right to draw from the larger Disputed Claims Reserve should their recovery exceed the amount set aside in Appellees' "sub-reserve". Section 7.5 of the Plan specifically provides for the QUIPS Stipulation and the QUIPS Stipulation was executed in furtherance of the Plan.

2

Moreover, the Bankruptcy Court's ruling that the QUIPS Stipulation must be read together with the Plan is required by the principle set forth in section 1129(b) of the Bankruptcy Code which prohibits unfair discrimination among similarly situated creditors, a requirement that must have been met for the Plan to be confirmed in the first instance. The Bankruptcy Court properly interpreted section 7.7 of the Plan to ensure that the Plan will treat all similarly situated creditors fairly. A contrary result would have allowed similarly situated creditors – the Appellees – to receive less than what they were entitled simply because of when their disputed claims became allowed claims, a result that would violate section 1129(b) of the Bankruptcy Code.

In light of the foregoing, the Bankruptcy Court's reasoning in denying the Plan Committee's Motion is unassailable.

## II.    Statement of Appellate Jurisdiction

The Court has jurisdiction over this appeal under 28 U.S.C. § 158 and Rule 8001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III.    Statement of Issues

The issue on appeal is whether the Bankruptcy Court properly denied the Plan Committee Motion seeking to make a surplus distribution when all Disputed Claims had not yet been resolved and thus no determination could be made regarding the existence of a surplus.

## IV.    Standard of Appellate Review

The facts and circumstances of this Appeal – the interpretation of a bankruptcy court's own order (i.e. the confirmed plan) – is reviewed under an abuse of discretion standard.

Once a plan of reorganization is confirmed, it "acts as a binding contract on all the parties thereto." USN Commc'ns, Inc. v. Worldnet Corp. (In re USN Commc'ns, Inc.), 280 B.R. 573, 592 (Bankr. D. Del. 2002); see also Gen. Elec. Capital Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.), 341 F.3d 738, 743 (8th Cir. 2003) (plan of reorganization acts like a contract that

3

120087.01600/40162000v.1

binds the parties that participate in the plan); Hills Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997

F.2d 581, 588 (9th Cir. 1993) (a reorganization plan should be construed as a contract). Moreover,

the plan is not only a contract, but it is also an order of the bankruptcy court. In re Dial Bus. Forms,

341 F.3d at 744. For this reason, in reviewing a bankruptcy court's interpretation of a confirmed

plan, the reviewing court should extend to that interpretation the same deference that is otherwise

paid to a court's interpretation of its own order and should, therefore, be reviewed under the "abuse

of discretion" standard. Id. (citing In re Weber, 25 F.3d 413, 416 (7th Cir. 1994); *accord* In re

O'Connor, 258 F.3d 392, 401 (5th Cir. 2001); Terex Corp. v. Metro. Life Ins. Co. (In re Terex

Corp.), 984 F.2d 170, 172 (6th Cir. 1993); Comm'n of Dep't of Pub. Utils. v. New York, New

Haven & Hartford R.R. Co., 178 F.2d 559, 563-64 (2d Cir. 1949)); see also First Western SBLC,

Inc. v. MAC-TAV, Inc., 231 B.R. 878, 883-84 (D.N.J. 1999) ("[w]e review the bankruptcy court's

interpretation of the [c]onfir[med] [p]lan under the abuse of discretion standard); Finova Capital

Corp. v. Larson Pharmacy Corp. (In re Optical Techs., Inc.), 425 F.3d 1294 (11th Cir. 2005) (court

found that although it generally reviewed legal conclusions by the bankruptcy court de novo, it

applied an abuse of discretion standard to a bankruptcy court's interpretation of its own order);

Endois Corp. v. Employers Ins. of Wausau (In re Consol. Indus. Corp.), 360 F.3d 712, 716 (7th Cir.

2004) ("We will not reverse a [bankruptcy] court's interpretation of its own order unless it is a

'clear abuse of discretion,' because a court that issued an order is in the best position to interpret

it.").[4]

---

[4]      The Plan Committee erroneously argues that this Court should apply a clearly erroneous standard to the
Bankruptcy Court's finding of fact and a plenary review to conclusions of law. Appellant Opening Brief, p.
13. While the Third Circuit has not squarely addressed the application of an abuse of discretion standard to a
review of a bankruptcy court's interpretation of a chapter 11 plan – its own order – the Plan Committee
inappropriately ignores the overwhelming case law addressing this issue.

4

## V.    Factual Background

Magten holds approximately 40% of the QUIPS. Law Debenture is the Indenture Trustee for the QUIPS. See App. Des. Nos. 94 & 95.

On April 16, 2004, Appellees commenced an adversary proceeding in the Bankruptcy Court based on NorthWestern's fraudulent transfer of substantially all of the utility assets of its directly owned subsidiary, Clark Fork & Blackfoot LLC ("Clark Fork"), to NorthWestern for inadequate consideration (the "Transfer") on November 15, 2002 (the "Fraudulence Conveyance Action"). See App. Des. No. 96. Though the Clark Fork assets had a value well in excess of $1 billion, the total consideration received for the Transfer was the assumption of approximately $700 million of liabilities by NorthWestern. See App. Des. No. 96, p. 2, ¶ 2. As a result of this Transfer, Clark Fork was rendered insolvent. Based on the Transfer, the Appellees filed the Fraudulent Conveyance Action against NorthWestern on behalf of the QUIPS holders seeking to set aside the fraudulent conveyance of the Clark Fork utility assets to NorthWestern. The QUIPS represented debt obligations of Clark Fork, which but for the Transfer would have remained solvent. The validity and effectiveness of a release purportedly exonerating Clark Fork from any liability with respect to the QUIPS and compelling their holders to look only to the insolvent NorthWestern is one of the issues to be resolved in the Fraudulent Conveyance Action.

On August 19, 2004, NorthWestern filed its Plan and the Second Amended and Restated Disclosure Statement (the "Disclosure Statement"). See App. Des. Nos. 7 & 8. On August 31, 2004, NorthWestern filed its revised Plan and Disclosure Statement, (see App. Des. Nos. 10 & 11), and on September 2, 2004, the Bankruptcy Court entered an order approving the Disclosure Statement. See App. Des. No. 12. Pursuant to the Plan, Magten and other holders of the QUIPS that chose to pursue the Fraudulent Conveyance Action, which if successful, would receive an

5

Allowed Class 9 Claim to be satisfied from the Disputed Claims Reserve.[5] See App. Des. No. 10,

pp. 36-37, § 4.8(b)(ii).

On October 19, 2004, the Bankruptcy Court entered an order confirming the Plan (the

"Confirmation Order"). See App. Des. No. 22. The Confirmation Order required NorthWestern to

"establish an initial reserve of 13.5% of New Common Stock allocated to Class 7 and Class 9 for

the Disputed Claims Reserve . . . pursuant to Section 7.5 of the Plan."[6] See App. Des. No. 22 p.

80-81. Section 7.5 of the Plan states in relevant part that:

> [NorthWestern] . . . shall maintain the Disputed Claims Reserve
> equal to the aggregate of any distributable amounts of Cash and
> New Common Stock equal to the relevant percentage of the
> Distributions to which holders of Disputed Claims would be
> entitled under this Plan if such Disputed Claims were Allowed
> Claims in the amount of such Disputed Claims or such lesser
> amounts required by a Final Order.

See App. Des. No. 10, p. 59, § 7.5.

---

5    Section 4.8(b)(ii) states in relevant part that:

> On the Effective Date . . . each holder of an Unsecured Subordinated Note
> Claim represented by the QUIPS Notes and related Claims and Causes of Action
> who accepts or rejects the Plan may opt to receive in full satisfaction, settlement,
> release, extinguishment and discharge of such Claim either, but not both:
>
> (1)  a Pro rata Share of 505,591 shares of New Common Stock . . . plus
>      Warrants exercisable for an additional 2.3% of New Common Stock
>      (collectively, "Option 1"); or
>
> (2)  a Pro Rata Share of recoveries, if any, upon resolution of the QUIPS
>      Litigation ("Option 2").
>
> . . .
>
> If such a holder of a class 8(b) Unsecured Subordinated Note Claim votes to
> accept or reject the Plan and chooses Option 2, then: (i) such holder's claims
> shall be treated as a Class 9 General Unsecured Claim, subject to estimation and
> reserves for Disputed Claims as provided for by Section 7.5 of the Plan, with
> distributions to holders of Class 8(b) Unsecured Subordinated Note Claims
> which choose Option 2 being made, if at all, only upon entry of a Final Order
> resolving the QUIPS Litigation (unless otherwise agreed to by the Debtor and
> the Committee); and (2) any New Common Stock which otherwise would have
> been distributable to such holder if such holder had chosen Option 1, shall be
> distributed, pro rata to Class 7 and Class 9, and the Warrants which otherwise
> would have been distributable will be cancelled.

6    The 13.5% reserve proposed by NorthWestern was predicated on representation that 13.5% of the stock was an
     amount equal to the relevant percentage of Distributions to which the holders of Disputed Claims would be
     entitled under the Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or
     such lesser amount as required by Final Order, as required by Section 7.5 of the Plan.

6

At all times during the confirmation hearing and the confirmation process, the information

regarding the methodology for establishing the reserve and the sufficiency of the reserve was solely

in NorthWestern's possession and control.

On November 1, 2004, pursuant to section 7.5 of the Plan providing that "[i]n lieu of

estimating, fixing or liquidating the amount of any Disputed Claim . . . such amount may be fixed

*by an agreement in writing by and between the Debtor and the holder of a Disputed Claims*",

NorthWestern and the Indenture Trustee filed the QUIPS Stipulation with the Bankruptcy Court.

See App. Des. No. 10, p. 59 (emphasis added). After notice of the QUIPS Stipulation was provided

to parties and no party objected to the QUIPS Stipulation, on November 3, 2004, the Bankruptcy

Court held a hearing and approved the QUIPS Stipulation. See App. Des. No. 33. Pursuant to the

QUIPS Stipulation, NorthWestern agreed to set aside a portion of the Disputed Claims Reserve

"solely to satisfy in full a $25 million Class 9 claim of the QUIPS Litigation Claims holders" (the

"QUIPS Claims Reserve") and set forth the rights of the litigation claims pertaining to the QUIPS

holders (the "QUIPS Litigation Claims") to recover on account of an Allowed Claim in excess of

that amount. See App. Des. No. 33, pp. 2-3. The QUIPS Stipulation provides in relevant part that

> [NorthWestern] shall set aside a portion of its initial reserve of 13.5% of
> New Common Stock solely to satisfy in full a $25 million Class 9 claim of
> the QUIPS Litigation Claims holders . . . For purposes hereof, any claim
> by any QUIP Litigation claimant will be afforded the treatment accorded
> Class 9 General Unsecured Claims, as set forth in the Plan. To the extent
> that the Allowed QUIPS Litigation Claims ultimately exceed $25 million,
> the holders of such claims shall have any deficiency satisfied out of the
> general Disputed Claims Reserve (as such is described in the Plan and the
> Confirmation Order).
>
> . . .
>
> [T]o the extent that the Debtor establishes any other segregated reserve for
> the benefit of individual creditors, or for any other reason, once the
> disputed claims of those individual creditors are resolved any excess
> common stock in those segregated reserves, if any, shall be released to the

7

> Disputed Claims Reserve, from which the QUIPS Litigation claimants and any other holder of a disputed Class 9 claim shall be entitled to draw . . . .

See App. Des. No. 33, pp. 2-3, ¶¶ 1, 3 (emphasis added).

Thus, by its express terms, the QUIPS Stipulation did not cap the recovery on account of the QUIPS Litigation Claims at $25 million. See Id. at p. 2 ¶ 1. Rather, the QUIPS Stipulation provided that an Allowed Claim in excess of $25 million would be satisfied from the Disputed Claims Reserve and that any excess common stock from segregated reserves that is released into the Disputed Claims Reserve can be used by the QUIPS holders to satisfy their claim. See Id. at p. 3, ¶ 3.

Law Debenture entered into the QUIPS Stipulation in reliance on NorthWestern's assertions that the Disputed Claims Reserve was sufficiently funded to comply with the terms of the Plan and the Confirmation Order and provide the holders of the QUIPS Litigation Claims with the same recovery accorded to holders of Allowed Class 9 Claims.

NorthWestern emerged from bankruptcy on November 1, 2004, and the Plan became effective (the "Effective Date"). See App. Des. No. 31.

On March 2, 2005, only four months after the Effective Date, at a hearing before the Bankruptcy Court in connection with a motion by Appellees to enforce the terms of a settlement agreement that had been executed by Appellees and NorthWestern, counsel for each of NorthWestern, the Plan Committee, and an ad hoc committee of Class 7 noteholders argued that the Disputed Claims Reserve did not contain sufficient New Common Stock to satisfy the terms of the settlement – despite the fact that the settlement provided holders of the QUIPS Litigation Claims with a recovery of less than the full amount of their claims. See App. Des. No. 41. p. 22 & No. 49 p. 41, lines 4-8.

Questions surrounding the sufficiency of the Disputed Claims Reserve led Magten and Law Debenture to initiate an adversary proceeding on April 15, 2005, against NorthWestern and its senior management alleging that because the Disputed Claims Reserve had not been properly funded, the order confirming the Plan had been procured by fraud and should be withdrawn pursuant to section 1144 of the Bankruptcy Code. See App. Des. No. 102. This proceeding has been stayed pending resolution of Magten's appeal of the Confirmation Order. See App. Des. No. 103.

On September 14, 2005, as NorthWestern continued its claims resolution process, it filed a Motion for Order Pursuant to Bankruptcy Rule 9019 Authorizing and Approving Settlement Agreement with PPL Montana, LLC and PPL Global, LLC (the "PPL Motion"). See App. Des. No. 71. Notably, the PPL Motion provided that the $50 million segregated reserve (the "PPL Reserve") within the Disputed Claims Reserve that had been established for the resolution of the claims among NorthWestern, PPL Montana, LLC and PPL Global, LLC (the "PPL Claims") was to be released into the Disputed Claims Reserve. See App. Des. No. 18.

On September 29, 2005, the Bankruptcy Court entered an order approving the PPL Motion (the "PPL Order"). See App. Des. No. 72. Pursuant to the PPL Order, the $50 million segregated reserve within the Disputed Claims Reserve that had been established for the resolution of the PPL Claims was to be released into the Disputed Claims Reserve. See App. Des. No. 72, p. 2.

Also, on September 29, 2005, the Plan Committee Motion was filed in which the Plan Committee asserted that pursuant to section 7.7 of the Plan, holders of the Allowed Class 7 Claims are entitled to their Pro Rata Share of any surplus distribution held in the Disputed Claims Reserve. See App. Des. No. 73.

Appellees timely filed a joint objection to the Plan Committee Motion. See App. Des. No. 77. NorthWestern also filed a response to the Plan Committee Motion that recognized that surplus

9

distributions cannot be made until the claims of Appellees have been resolved. See App. Des. No. 85. The Plan Committee, thereafter, filed an omnibus reply to Appellee's joint objection and NorthWestern's response. See App. Des. No. 86.

A hearing on the Plan Committee Motion was held on January 11, 2006 before the Honorable John L. Peterson ("January 11[th] Hearing"). At the January 11th Hearing, NorthWestern's counsel announced that, based upon his review, there was "roughly a balance of 2.3 [million] . . . shares available for distribution" in the Disputed Claims Reserve. See App. Des. No. 91, pp. 43-44. This statement, however, was not substantiated by any evidence. Thus, to date, based on NorthWestern's inconsistent representations, it remains unclear whether the Disputed Claims Reserve contains enough New Common Stock to afford Appellees the same recovery afforded to holders of Allowed Class 9 Claims should Appellees' Disputed Claims be allowed in full.

After hearing arguments from all parties, Judge Peterson denied the relief sought by the Plan Committee. Judge Peterson stated on the record that section 7.7 of the Plan required a full resolution of Appellees' Disputed Claims before there can be a distribution and such a determination could "only makes sense to [the Bankruptcy Court] because if you don't get them all reserved [sic], you don't know what is there (indiscern.). And Magten isn't resolved. . . . So between the [S]tipulation and [section] 7.7 [of the Plan], there has to be a protection to the [D]isputed [C]laim of Magten [and Law Debenture]." See App. Des. No. 91, p. 53-54.

Thereafter, on February 7, 2006, Judge Peterson entered the Order denying the Plan Committee Motion finding, among other things:

> The [Plan Committee] Motion is premature in view of the litigation surrounding the unresolved and disputed claims of . . . [Appellees].
>
> There are surplus shares in the Disputed Claims Reserve established pursuant to Section 7.5 of the Plan, at the date of hearing, subject however to the Magten [and Law Debenture] [l]itigation for final surplus determination.

10

> Section 7.7 of the Plan requires full resolution of all disputed claims
> before there can be any Surplus Distribution and does not require
> NorthWestern to distribute Surplus Distribution from the Disputed
> Claims Reserve every six (6) months from the Effective Date of the
> Plan.
>
> The QUIPS . . . Stipulation applies to protect potential distribution to
> Magten and Law Debenture in the event their recovery exceeds the
> segregated reserve provided for therein.
>
> Section 7.7 of the Plan and the QUIPS . . . Stipulation preclude any
> distribution from the Disputed Claim Reserve until the disputed
> claims of Magten and Law Debenture with respect to the QUIPS
> Litigation are resolved.

See App. Des. No. 92, p. 3, ¶ ¶ H-L.

On the same day the Bankruptcy Court issued the Order, the Plan Committee filed a Notice

of Appeal of the Order. See App. Des. No. 93. On February 16, 2006, the Plan Committee filed its

Appellant Designation of Contents for Inclusion in Record on Appeal and Statement of Issue to be

Presented on Appeal, (see Bankr. Docket No. 3446), and, on February 27, 2006, Appellees filed a

Joint Designation of Additional Items to be Included in the Record on Appeal. See Bankr. Docket

No. 3450. The transmittal of the record to this Court occurred on March 8, 2006. See Bankr.

Docket No. 3459.

## VI.    Argument

The Plan Committee argues that the Bankruptcy Court's interpretation of section 7.7 of the

Plan is contrary to the express and unambiguous language of the Plan because, according to the Plan

Committee, section 7.7 requires NorthWestern to make Surplus Distributions every six months after

the Effective Date regardless of whether or not all Disputed Claims are resolved. The Plan

Committee's argument is flawed in three respects. First, it fails to read the Plan in conjunction with

the QUIPS Stipulation, which the Bankruptcy Court correctly incorporated into its interpretation of

section 7.7 of the Plan. Second, the Plan Committee's argument fails to take into account the

11

practical definition and concept of a "surplus" applicable to section 7.7 of the Plan. Third, in reading section 7.7 of the Plan, the Plan Committee fails to account for the equitable principles required by section 1129 of the Bankruptcy Code, which prohibit the unfair discrimination and disparate treatment of similarly situated creditors.

## 1.    The Bankruptcy Court Correctly Took Account of the QUIPS Stipulation When Rendering its Decision

The Plan Committee contends that the Bankruptcy Court erred in its interpretation of section 7.7 of the Plan and that distributions must be made from the Disputed Claims Reserve every six months regardless of the effects on creditors whose claims remain in dispute. In making this argument, however, the Plan Committee fails to consider the QUIPS Stipulation, which must be read in conjunction with the Plan and is provided for by section 7.5 of the Plan. Specifically, section 7.5 of the Plan provides that "[i]n lieu of estimating, fixing or liquidating the amount of any Disputed Claim, the Bankruptcy Court may determine the amount to be reserved for such Disputed Claim . . . or such amount may be fixed *by an agreement in writing by and between the Debtor and the holder of a Disputed Claims*." (emphasis added). See App. Des. No. 10, p. 59. The QUIPS Stipulation, which was filed on notice to all parties and to which no party objected, was executed to ensure that Appellees' Disputed Class 9 Claim was adequately protected as mandated by the Plan and the Confirmation Order.

The QUIPS Stipulation conclusively resolves the issue on Appeal. The QUIPS Stipulation is explicit that the QUIPS Claims Reserve was not intended to limit the recovery of the QUIPS Holders and provides that, to the extent that the QUIPS Litigation Claims exceed their sub-reserve, any deficiency is to be satisfied from the general Disputed Claims Reserve. See App. Des. No. 33, pp. 2-3, ¶ 1. The QUIPS Stipulation also specifically provides that if any other sub-reserves are created, such as the PPL Reserve, and the amount of such other claim, (e.g., the PPL Claims) are

12

settled for less and released back into the Disputed Claims Reserve, the QUIPS Holders "shall be entitled to draw" from those reserves. See App. Des. No. 33, p.3, ¶ 3.

Because, the QUIPS Stipulation unequivocally provides that the QUIPS Holders would be entitled to additional shares from the overall Disputed Claims Reserve in satisfaction of the QUIPS' Class 9 Claim, allowing a distribution of "surplus" shares at this time - when the Disputed Claims of Appellees remains unresolved - would deny the Appellees, if their claims are allowed in full, their right to receive their full Class 9 recovery. As discussed in Section 3 below, such a result is inequitable because similarly situated creditors would be receiving disparate distributions solely based on when such claims became Allowed Claims, thereby, denying Appellees the full benefit of their bargain as set forth in the Plan.

The QUIPS Stipulation compliments the Plan by virtue of the fact that stipulations are provided for pursuant to section 7.5 of the Plan. As with other stipulations entered into by NorthWestern and Disputed Claimants (e.g., the PPL Claims), notice of the QUIPS Stipulation was provided to all parties in interest and all parties were given the opportunity to examine the terms of the QUIPS Stipulation and respond accordingly. The Plan Committee (f/k/a the Official Creditors Committee (the "Official Committee")[7] received notice of and had the opportunity to object to the QUIPS Stipulation. However, the Official Committee did not object to the QUIPS Stipulation. Further, like the other stipulations entered into by NorthWestern and Disputed Claimants, the Bankruptcy Court approved the QUIPS Stipulation because its terms worked in concert with those in the Plan. Thus, the Bankruptcy Court correctly held that the terms of both the QUIPS Stipulation and section 7.7 of the Plan must be given effect.

---

[7]     Paul, Weiss, Rifkind, Wharton & Garrison LLP was counsel to the Official Committee and is currently counsel to the Plan Committee.

## 2. The Plan Committee's Argument Fails to take into Account the Practical Definition and Concept of a "Surplus" Applicable to Section 7.7 of the Plan

The plain language of the Plan precludes distributions from the Disputed Claims Reserve at this time. A "surplus", by definition, is "more than what is needed or required." See Webster's II New College Dictionary. Accordingly, the concept of "surplus distributions" in section 7.7 of the Plan is premised on the idea that the Disputed Claims Reserve was funded in accordance with section 7.5 of the Plan such that (i) there are sufficient funds in the Disputed Claims Reserve to satisfy *all* Disputed Claims and (ii) the distribution of any shares before the resolution of all Disputed Claims would not potentially harm other similarly situated unsecured creditors.

First, given that there remains Disputed Claimants whose claims have not been liquidated, it is not possible for there to be a determination that there is a "surplus" of shares in the Disputed Claims Reserve. Moreover, to date, NorthWestern has given inconsistent representations to the Bankruptcy Court regarding the sufficiency of the Disputed Claims Reserve. NorthWestern's latest representation to the Bankruptcy Court is that there are approximately 3.1 million shares of New Common Stock in the Disputed Claims Reserve. See App. Des. 91 pp. 43-44. However, this representation *was not* corroborated with any evidence. In fact, it contradicted NorthWestern's previous representation to the Bankruptcy Court during the hearing regarding Appellees' 9019 motion, in which NorthWestern and the Plan Committee argued that the Disputed Claims Reserve did not contain sufficient New Common Stock to satisfy the terms of the settlement – even though the settlement provided holders of the QUIPS Litigation with a recovery less than the full amount of their claims. See App. Des. No. 41, p. 22 & No. 49, p. 22, lines 4-8.

Despite these facts and without regard for either the sufficiency of the Disputed Claims Reserve or the rights of Appellees – the remaining creditors to hold Disputed Claims – the Plan Committee asserts that section 7.7 of the Plan requires a distribution of shares. The Plan Committee

14

argues that a "surplus" distribution should be made because the PPL Claims were settled for amounts less than the full amount of their claims. The Plan Committee, however, disregards the obvious: if the Disputed Claims Reserve was improperly funded and does not contain sufficient stock to provide Appellees with the same recovery that holders of Allowed Class 9 Claims have received, then the Disputed Claims Reserve does not, by definition, contain a "surplus". Therefore, providing a "surplus distribution" under these circumstances is premature and would leave Appellees with the inequitable and unfair prospect of recovering less than they are entitled to under the Plan.

3.    **The Bankruptcy Court Properly Denied the Plan Committee Motion in Light of the Prohibition of Unfair Discrimination Pursuant to Section 1129(b)(1) of the Bankruptcy Code**

The Plan Committee's argument that the Bankruptcy Court erred in its interpretation of the Plan by not permitting a surplus distribution pursuant to section 7.7 of the Plan fails to account for the equitable principles set forth in section 1129 of the Bankruptcy Code, which prohibits the unfair discrimination of creditors that are similarly situated.

Section 1129(b)(1) of the Bankruptcy Code mandates that a plan of reorganization must not unfairly discriminate with respect to the treatment afforded to similarly situated creditors. Section 1129(b) of the Bankruptcy Code provides, in relevant part, that

> (1) [T]he court, on request of the proponent of the plan, *shall confirm the plan . . . if the plan does not discriminate unfairly, and is fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 US.C. 1129(b)(1) (emphasis added).

See also In re Armstrong World Indus., Inc., 432 F.3d 507, 511-12 (3d Cir. 2005) ("If the plan is not consensual, a court may still confirm as long as the plan meets the other requirements of section 1129(a), and 'does not discriminate unfairly, and is fair and equitable' as to any dissenting impaired

15

class"); In re Exide Techs., 303 B.R. 48, 58 (Bankr. D. Del. 2003) (in addition to other requirements, the plan proponent must also show that the plan does not unfairly discriminate against dissenting classes and the treatment of the dissenting classes is fair and equitable); In re Genesis Health Ventures, Inc., 280 B.R. 339, 346 (Bankr. D. Del. 2002) ("[u]nder the Bankruptcy Code, creditors of the same class are to be treated in the same manner, unless they consent to receive less favorable treatment") (citing 11 U.S.C. § 1123(a)(3)-(4); 11 U.S.C. § 1129(b)(1)); Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.), 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) ("A plan discriminates unfairly if it singles out the holder of some claim or interest for particular treatment").

In order to provide a mechanism to protect the holders of Disputed Claims, and to ensure that such holders were not prejudiced by confirmation of the Plan prior to the resolution of all Disputed Claims, section 7.5 of the Plan required that NorthWestern "maintain the Disputed Claims Reserve equal to the aggregate of any distributable amount of Cash and New Common Stock equal to the relevant percentage of Distributions to which holders of Disputed Claims would be entitled under this Plan if such Disputed Claims were Allowed Claims in the amount of such Disputed Claim or such lesser amount as required by the Final Order." This reserve structure was set up to enable the Plan to satisfy the requirements of Section 1129(b)(1) of the Bankruptcy Code so that the Plan did not unfairly discriminate against holders of Class 9 Disputed Claims. Specifically, the Disputed Claims Reserve is meant to provide assurance that, once Disputed Claims are Allowed, such holders will receive the same distribution as claims that were allowed at the time of confirmation. Absent the establishment of the Disputed Claims Reserve, the Bankruptcy Court would not have been able to confirm NorthWestern's Plan.

In light of section 1129(b)(1) of the Bankruptcy Code prohibiting unfair discrimination, Judge Peterson correctly denied the Plan Committee Motion. Had the Bankruptcy Court granted the

16

Plan Committee Motion, similarly situated creditors would receive disparate distributions solely because of the timing of when such claims became Allowed Claims – this would be contrary to both the principles of the Bankruptcy Code and the express language of the Plan. In addition, in light of NorthWestern's inconsistent representations to the Bankruptcy Court regarding the sufficiency of the Disputed Claims Reserve, it adds insult to injury for the Plan Committee to argue that those creditors who have already received a recovery in excess of 100% of the amount of their claims should enjoy an additional "surplus" distribution when Appellees, whose claims are still disputed, would face the prospect of receiving less than they are entitled to under the Plan.[8]

Moreover, creditors are entitled to rely on a plan of reorganization that promises a holder of a disputed claim that such creditor's potential recovery has been segregated and reserved such that holders of disputed claims will not be prejudiced if a plan is confirmed prior to the complete resolution of all disputed claims. To allow a debtor to reserve stock on account of such claims only to later distribute it to creditors that have already received a full recovery would severely undermine public confidence in the bankruptcy process and would violate the terms of a contract.

The Plan Committee's description of the Bankruptcy Court's decision as a modification of the Plan in violation of section 1127 of the Bankruptcy Code is frivolous. Rather, the Bankruptcy Court merely used its continuing authority over NorthWestern's chapter 11 case to enforce the provisions of the Plan it previously confirmed.[9]  Section 13.1(g) of the Plan provides the

---

[8]    To date, holders of Allowed Claims in Classes 7 and 9 have received shares of New Common Stock that were valued in the Plan at approximately $20.00 per share, representing a recovery of approximately 63.6% of their claims based on the Plan Value of the New Common Stock. However, as Magten demonstrated at the Confirmation Hearing, NorthWestern grossly understated its enterprise value, and the value of the New Common Stock has increased more than 75% since the Effective Date, rising at times to prices as high as $35.00 per share. Thus, based on the value of the New Common Stock, holders of Allowed Claims in Classes 7 and 9 have already received nearly a [115]% recovery on account of their Allowed Claims. To allow such holders to further enhance their recoveries at the expense of the holders of Disputed Claims is inequitable and discriminatory.

[9]    Section 13.1(e) of the Plan provides the bankruptcy court with the exclusive jurisdiction to "enforce the provisions of the Plan". See App. Des. No. 10, p. 76, § 13.1(e).

Bankruptcy Court with the "exclusive jurisdiction" to, among other things, "correct any defect, cure any omission, or reconcile any inconsistency in this Plan or in the Confirmation Order as may be necessary to carry out its purpose and the intent of the Plan." See App. Des. No. 10, p. 76, § 13.1(g). Such a provision empowers the Bankruptcy Court to take into consideration the applicable provisions of the Bankruptcy Code and to ensure that any reading of the Plan treats all similarly situated creditors fairly and equitably and does not unfairly discriminate against them. In that regard, the Bankruptcy Court correctly took into consideration the rights provided to Appellees in the QUIPS Stipulation to ensure that their rights were protected as required by section 1129 of the Bankruptcy Code. See Beal Bank v. Jack's Marine, Inc., 201 B.R. 376, 380 (E.D. Pa. 1996) (courts have distinguished between a bankruptcy court's inability to "modify" a plan and the bankruptcy court's ability to "interpret plan provisions to further equitable concerns.").

Thus, the Bankruptcy Court properly concluded that a resolution of all Disputed Claims is required before there could be a Surplus Distribution because of the inequity that would result if the recovery for Disputed Creditors is not protected. Such a holding by the Bankruptcy Court is consistent with and required by the fundamental principle that all creditors, whether they have disputed claims or allowed claims that are *pari passu* with one another, are entitled to receive an identical recovery and not be subject to unfair discrimination.

18

CONCLUSION

WHEREFORE, Appellees respectfully request that (i) this Appeal be denied for the

reasons set forth herein[10]; and (ii) the Court grant any such other relief it deems just and proper.

Dated:  Wilmington, Delaware
        May 11, 2006


BLANK ROME LLP


*Dale R. Dubé*

Dale R. Dubé (DE No. 2863)
Bonnie Glantz Fatell (DE No. 3809)
1201 Market Street, Suite 800
Wilmington, DE 19801
Telephone:   (302) 425-6400
Facsimile:   (302) 425-6464

- and -

FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
  LLP
Bonnie Steingart
Gary L. Kaplan
John W. Brewer
One New York Plaza
New York, NY 10004
Telephone:  (212) 859-8000
Facsimile:  (212) 859-4000


Counsel for Magten Asset Management Corporation

---

[10]    To the extent that the Court determines that a distribution of shares from the Disputed Claims Reserve should be made prior to the resolution of Appellees' claims, the Court should remand to the Bankruptcy Court for a determination of the amount of shares in the Disputed Claims Reserve to ensure that Appellees can fully recover on account of their claims. First, the Bankruptcy Court must make a finding as to the total amount of New Common Stock remaining in the Disputed Claims Reserve. If the Bankruptcy Court determines, based on an evidentiary record, that there is, in fact, sufficient stock in the Disputed Claims Reserve to satisfy Appellees claims in full, the Bankruptcy Court should be required to estimate the full amount of Appellees' Disputed Claim, including both pre-petition and post-petition interest as well as the legal fees and expenses of both Magten and Law Debenture.

SMITH, KATZENSTEIN & FURLOW, LLP


/s/ Kathleen M. Miller
Kathleen M. Miller (DE No. 2898)
800 Delaware Avenue, 7th Floor
P.O. Box 410
Wilmington, DE 19899
Telephone:   (302) 652-8400
Facsimile:   (302) 652-8405

- and -

NIXON PEABODY LLP
John V. Snellings
Amanda Darwin
100 Summer Street
Boston, MA 02110
Telephone:   (617) 345-1201
Facsimile:   (866) 947-1732
Counsel for Law Debenture Trust Company

20

120087.01600/40162000v.1

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of May, 2006, I served by hand delivery and filed

electronically the ANSWERING BRIEF OF APPELLEES MAGTEN ASSET MANAGEMENT

CORPORATION AND LAW DEBENTURE TRUST COMPANY OF NEW YORK using

CM/ECF which will send notification of such filing(s) to the following:

Denise Seastone Kraft, Esquire
EDWARDS ANGELL PALMER & DODGE
LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
dkraft@edwardsangell.com

Neil B. Glassman, Esquire
Charlene D. Davis, Esquire
Eric M. Sutty, Esquire
THE BAYARD FIRM
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
nglassman@bayardfirm.com
cdavis@bayardfirm.com
esutty@bayardfirm.com
Phone: 302 655-5000
nglassman@bayardfirm.com
cdavis@bayardfirm.com
esutty@bayardfirm.com

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
Rebecca L. Butcher, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801
landis@lrclaw.com
mumford@lrclaw.com
butcher@lrclaw.com

Robert J. Dehney, Esquire
Curtis S. Miller, Esquire
MORRIS NICHOLS ARSHT & TUNNELL
1201 Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
rdehney@mnat.com
cmiller@mnat.com

David A. Jenkins, Esquire
SMITH KATZENSTEIN & FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899
daj@skfdelaware.com

Victoria Watson Counihan, Esquire
Dennis A. Meloro, Esquire
GREENBERG TRAURIG LLP
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, DE 19801
counihanv@gtlaw.com
melorod@gtlaw.com

Kathleen M. Miller, Esquire
SMITH KATZENSTEIN & FURLOW LLP
800 Delaware Avenue
P. O. Box 410
Wilmington, DE 19899
kmm@skfdelaware.com

I also certify that, on this 11th day of May, 2006, I served the aforementioned document,

by e-mail and Federal Express, upon the following non-registered participants:

Dennis E. Glazer, Esquire
Paul Spagnoletti, Esquire
DAVIS POLK & WARDWELL
450 Lexington Avenue, Room 3004
New York, NY 10017
dennis.glazer@dpw.com
paul.spagnoletti@dpw.com

Bijan Amini, Esquire
Avery Samet, Esquire
STORCH AMINI & MUNVES PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
bamini@samlegal.com
asamet@samlegal.com

Alan W. Kornberg, Esquire
Margaret A. Phillips, Esquire
Ephraim I. Diamond, Esquire
PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
akornberg@paulweiss.com
mphillips@paulweiss.com
ediamond@paulweiss.com

Stanley T. Kaleczyc, Esquire
Kimberly A. Beatty, Esquire
BROWNING, KALECZYC, BERRY
 & HOVEN, P.C.
139 North Last Chance Gulch
P.O. Box 1697
Helena, Mt 59624
stan@bkbh.com
kim@bkbh.com

Steven J. Reisman, Esquire
Joseph D. Pizzurro, Esquire
Nancy E. Delaney, Esquire
Miriam K. Harwood, Esquire
CURTIS, MALLET-PREVOST,
 COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061
sreisman@cm-p.com
jpizzurro@cm-p.com
ndelaney@cm-p.com
mharwood@cm-p.com

Jesse H. Austin, III, Esq.
Karol K. Denniston, Esq.
PAUL, HASTINGS, JANOFSKY &
 WALKER LLP
600 Peachtree Street, Suite 2400
Atlanta, GA 30308
jessaustin@paulhastings.com
karoldenniston@paulhastings.com

John V. Snellings, Esquire
Amanda D. Darwin, Esquire
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110-1832
jsnellings@nixonpeabody.com
adarwin@nixonpeabody.com

Philip Bentley, Esquire
Matthew J. Williams
KRAMER LEVIN NAFTALIS &
 FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
pbentley@kramerlevin.com
mwilliams@kramerlevin.com

Dale R. Dubé  (I.D. No. 2863)

2

120087.01600/40162000v.1